IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

F  I  L  E  D

JAN 1 0 2017

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

RICKY JOVAN GRAY,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        Civil Action No. 3:16CV982–HEH
                                     )
TERENCE RICHARD McAULIFFE,           )
*et al*,                             )
        Defendants.                  )

## MEMORANDUM OPINION
### (Denying Motion for Preliminary Injunction and Temporary Restraining Order)

Plaintiff Ricky Jovan Gray, a Virginia state inmate sentenced to death, brings this

civil rights action under 42 U.S.C. § 1983.  Gray is currently scheduled to be executed by

lethal injection on January 18, 2017, a date that was set on November 21, 2016.  On

December 14, 2016, Gray filed this Complaint for Declaratory Judgment, and on

December 16, 2016, he filed this Emergency Motion for Temporary Restraining Order

and Preliminary Injunction.

Gray alleges that "[t]here is a constitutionally intolerable risk that, on January 18,

2017, the Virginia Department of Corrections ("VDOC") will chemically torture [him] to

death" and that "[t]he VDOC will do so behind a veil of secrecy that frustrates Mr.

Gray's efforts to learn any meaningful details about the chemicals that will be used to

cause his death."  (Compl. ¶ 1, ECF No. 1.)  Gray contends that "[t]he risk of chemical

torture is in violation of [his] Eighth Amendment right to be free from cruel punishment"

and that "[t]he veil of secrecy that the VDOC has pulled across the details surrounding

how Mr. Gray is to be executed is a violation of Mr. Gray's Fifth and Fourteenth Amendment right to Procedural Due Process." (*Id.*) Specifically, Gray speculates that the compounded midazolam that the VDOC intends to use as the first drug in its three-drug protocol will not sufficiently anesthetize him before the administration of the second- and third-stage drugs. Gray also challenges Virginia's plan to use a second compounded drug in the third stage of the lethal injection protocol.

The Court's central focuses are Gray's Motion for Preliminary Injunction and Defendants' Opposition thereto. On January 3, 2017, the Court heard evidence and oral argument on the Motion for Preliminary Injunction. For the reasons set forth below, Gray's Motion will be denied.

## I. Pertinent Procedural and Factual Background

It has been eleven years since Gray brutally murdered Kathryn and Bryan Harvey and their two young daughters, Stella and Ruby, on New Year's Day, 2006. A Virginia jury convicted Gray of five counts of capital murder and sentenced him to death on two of the counts, the murders of Stella and Ruby Harvey. Since then, Gray has unsuccessfully pursued a host of direct and post-conviction challenges and appeals in both state and federal courts. On October 3, 2016, the United States Supreme Court denied Gray's petition for a writ of certiorari challenging his convictions and death sentences. *Gray v. Zook*, 137 S. Ct. 84 (2016). Faced with his impending execution, Gray filed the instant challenge.

The Supreme Court of Virginia aptly summarized the undisputed evidence of his guilt as follows:

2

On the morning of January 1, 2006, Kathryn and Bryan Harvey and their two daughters, Stella and Ruby, were killed in the Harveys' home in the City of Richmond. Firefighters, responding to a call that the Harveys' home was burning, discovered the bodies of Kathryn and Ruby in the basement as they attempted to fight the fire. The house was filled with "black smoke" and the basement was burning and had "[z]ero visibility and a lot of heat." Soon after the firefighters removed the bodies of Kathryn and Ruby from the basement, they determined that the bodies showed evidence of "battle signs" and that the victims' legs had been bound. At that point the firefighters stopped their rescue efforts and summoned the police.

Detective Dwyer of the Richmond Police Department then discovered Stella in the basement under a futon "with her hands behind her back, tape around her mouth." Bryan was discovered on the floor of the basement with orange electrical cord wrapped around his wrists and feet, with "melted tape around his face [and a] large wound to his neck area." Detective Dwyer also found two claw hammers, two broken wine bottles, a knife handle and a separate knife blade in the basement. Those items, as well as several photographs of the scene, were admitted into evidence at trial.

An autopsy revealed that Bryan had been cut eight times in his neck and underneath his chin, and those wounds, although "[v]ery painful," were not immediately fatal. His mouth had been gagged and taped. Six lacerations were made to the left side and back of Bryan's skull, each caused by blows from a hammer. He experienced severe third degree burns to his skin. Bryan died from the wounds to his skull.

Kathryn had been cut three times in her neck and chest, once in her back, and those wounds caused bleeding and pain but were not fatal. Multiple lacerations were made to Kathryn's skull as a result of blows from a hammer. The hammer blows caused a fracture to the plate above Kathryn's eyes, resulting in bleeding behind her eyes. Kathryn died from the blunt force injuries to her head.

Ruby's throat had been sliced through to her trachea, a wound that was not fatal but obstructed her breathing. Her head was also fractured and cut, causing brain tissue to exude from her skull. She had also been stabbed in the back with enough force that the knife had passed through her ribs and into her lungs. Ruby died from the blunt force injuries to her head and the stab injury to her lungs.

Stella's neck had been cut six times, with the stab wounds having penetrated her trachea and esophagus. Stella's head was also bludgeoned by a hammer, causing brain tissue to exude from her skull. She died from a combination of smoke inhalation, carbon monoxide poisoning and blunt force injury to her head.

Forensic evidence showed that the knife blade recovered from the Harveys' home had traces of blood from Kathryn, Stella, Ruby and Bryan. Bryan and Stella's DNA was discovered on the shaft of one of the recovered hammers. Kathryn's DNA was identified on the handle of the other hammer.

Evidence at trial established that Gray, Ray Dandridge and Ashley Baskerville were driving the streets of Richmond in Gray's van during the mid-morning of January 1, 2006 "looking for a house to rob." Gray and Dandridge "spotted a door open" at the Harveys' home, entered the house, and forced Kathryn, Bryan and Ruby into the basement. Stella was not home when Gray and Dandridge entered. In the basement, Gray assured the three family members that he and Dandridge would leave after they took what they wanted from the home. Gray then used electrical cords to tie Bryan's wrists behind his back and bind his ankles together.

Before Gray and Dandridge could plunder the house, they heard a noise upstairs on the home's main level. Kiersten Perkinson, a family friend, had arrived at the Harveys' home to deliver the Harveys' daughter, Stella, along with Perkinson's own daughter, Grace Lynn, from a slumber party the previous evening.

Hearing the commotion, Kathryn explained to Gray that her daughter had returned from a slumber party, so Gray permitted Kathryn to go upstairs to bring her daughter downstairs to the basement. Perkinson heard Kathryn "running up the stairs" from the basement, and upon reaching the top of the basement stairs, she appeared "pale and ashen." Stella ran past her mother and down the stairs into the basement, but Kathryn blocked Grace Lynn's path so she could not follow Stella downstairs. Kathryn told Perkinson that she did not feel well, so Perkinson and Grace Lynn left the house.

Downstairs, Gray bound the hands and feet of all the Harveys and placed clear packing tape over their mouths, but he assured them that everything would be okay. Gray and Dandridge then began collecting the items from the home they intended to steal. Kathryn attempted to comfort her distraught daughters, and she told Gray that he should take what he wanted and just leave. Suddenly, Gray took a razor knife and cut Kathryn's throat and then cut the throats of the young girls and Bryan. When Gray saw that his victims were still moving, he took a nearby claw hammer and began repeatedly beating each of the Harveys in the head. When they stopped moving, Gray poured two bottles of wine on an easel in the basement and lit a match, starting the fire. Gray and Dandridge then left the burning home with the items they had stolen.

John Hott, a family friend of the Harveys, arrived at the Harveys' home for a New Year's Day party at about 1:45 p.m. and noticed smoke

4

coming from the house. He immediately ran to a neighbor's home and called "911".

Less than a week later, Richmond police received a tip that Gray was a suspect in the murders, and a member of the Richmond Police Department contacted the Philadelphia, Pennsylvania Police Department requesting they investigate a location where Gray may be staying and to be on the lookout for a particular vehicle believed related to the Harvey murders. In the early morning hours of January 7, 2006, Philadelphia police obtained a search warrant, and a SWAT team entered the location where Gray was suspected to be staying and found him in the basement. Gray was arrested and advised of his *Miranda* rights. After learning that Dandridge was also being questioned, he asked the Philadelphia police: "Can I tell you my side of the story?"

As part of a signed confession, Gray described in detail how he and Dandridge entered the Harveys' home and attacked the Harveys, in which he stated:

> [I]t was a real nasty scene. How am I suppose[d] to explain something like what happened? I started cutting their throats and they kept getting up and they [were] scaring me. I remember seeing the hammer and picking it up, and then . . . I was just hitting them all with the hammer. All I know is nobody was moving when I left out there.

Gray admitted that Dandridge spent most of this time searching the home for items to steal, and that only Gray used the hammers to attack the Harveys.

Gray stipulated at trial that Bryan's wedding ring, as well as a cookie plate and a basket from the Harveys' home, were discovered in a location Gray provided to police, who also recovered from Gray a computer stolen from the Harveys' home. Gray also stipulated that the boots found at the residence in Philadelphia belonged to him. Bryan and Stella's blood stains were discovered on Gray's boots. The Commonwealth also introduced photographs of the dead bodies as exhibits during the trial, and the jury was permitted to view these exhibits. At the time of the murders, Gray was twenty-eight years old. Ruby was four years old at the time of her death, and Stella was nine years old at the time of her death.

*Gray v. Commonwealth*, 645 S.E.2d 448, 452–54 (Va. 2007) (alterations in original).

During the sentencing phase of his criminal proceedings, "[e]xtensive evidence was also presented to show a history of violent acts perpetrated by Gray." *Id.* at 454.

Lieutenant Daniel Stanek of the City of Washington, Pennsylvania Police Department testified about the discovery of the dead body of Gray's wife, Treva, on November 5, 2005. Gray was questioned at the time but was not arrested for her murder. After his arrest for the murders of the Harveys in January 2006, Gray also confessed to killing his wife with the help of Dandridge by bludgeoning her to death with a lead pipe.

Detective William Brerton of the Richmond Police Department described how, also on January 1, 2006, he learned of another set of murders committed in Richmond. Executing a search warrant, police discovered the dead bodies of Percyell Tucker, his wife, Mary, and Mary's daughter, Ashley Baskerville all in their home. Dr. Darin Trelka, a medical examiner, testified that the autopsy revealed Percyell's head had been "covered with Saran Wrap," with a sock stuffed into his mouth and duct-taped shut. Percyell probably struggled for several minutes before he died from suffocation. Mary's mouth had been gagged, with duct tape over her eyes. Her neck and chest had been cut four times. Mary struggled several minutes before she died from suffocation. Ashley was found with a plastic shopping bag over her head and taped to her neck with duct tape. Her face was wrapped in duct tape and a sock stuffed into her mouth. Ashley also struggled for several minutes before she died from suffocation.

Gray's vehicle was discovered three blocks from the Tucker's home, and the Tucker's stolen vehicle was located in Philadelphia where Gray was arrested. Gray confessed to murdering the Tucker family.

Police also learned that Gray assaulted a man in Arlington, Virginia on New Year's Eve, 2005. At the sentencing phase of Gray's trial, Ryan Carey testified that as he arrived at his parent's home after work on December 31, he was attacked by two men. He was forced to the ground and stabbed multiple times. Carey escaped the assault and rushed to his father's home covered in blood. Carey's father contacted emergency personnel, who took Carey to a hospital where his condition was stabilized. After two months of hospitalization, Carey was able to return home, although he lost the use of his right arm. Gray confessed to assaulting Carey with Dandridge's assistance and stipulated that Carey's blood was found on Gray's boots.

Also testifying at the penalty phase of the trial were Mark Harvey, Bryan's older brother, and Steven Culp, Kathryn's older brother. Each described a loving relationship with their sibling and the devastating grief and emotional impact of the murders upon the extended families.

*Id.* at 454–55.

## II.    Pertinent Allegations in the Complaint and Motion for Preliminary Injunction

Gray contends that "this Court should temporarily and preliminarily enjoin

Defendants from executing Mr. Gray on January 18, 2017, and order that Mr. Gray may

take discovery—including discovery that may reveal the identity of the compounding

pharmacy that prepared th[e] compounded midazolam and compounded potassium

chloride at issue in this matter . . . ." (Br. Supp. Mot. Prelim. Inj. 30, ECF No. 14.)   Gray

claims that midazolam "presents a host of serious risks" (*Id.* at 9), because while it "can

render inmates initially unconscious, it cannot produce and maintain anesthesia." (*Id.* at

7–8 (footnote omitted).)   Gray argues that the VDOC's planned use of compounded

drugs, including compounded midazolam, carries a demonstrated risk of inflicting severe

pain upon him.  (*Id.* at 9–13.)   Gray contends that using midazolam and potassium

chloride prepared by a compounding pharmacy "adds an additional layer of intolerable

risk" because, "[u]nlike ordinary pharmaceutical manufacturers, non-traditional

compounding pharmacies are not subject to federal Good Manufacturing Practice

Guidelines and FDA oversight." (*Id.* at 10 (citation omitted).)

Gray argues that "[i]t is nearly impossible to verify the quality of [the raw

ingredients, called Active Pharmaceutical Ingredients ("APIs"),] used in compounding"

(*Id.*), which "create[s] a significant risk that compounded preparations will not be

pharmacologically similar to the FDA-approved drugs they imitate." (*Id.* at 11.)   Gray

also cites concerns about mislabeling and the risk of contamination during the

manufacturing process.  (*Id.* at 11–12.)

7

Gray notes that high-risk sterile drugs like midazolam and potassium chloride would have a maximum beyond use date ("BUD") of 24 hours if stored at room temperature, 72 hours if refrigerated, and 45 days if frozen. (*Id.* at 12.) Gray explains that "[t]he bottles holding the purported compounded midazolam and compounded potassium chloride supplied by the VDOC have labels suggesting that the 'projected expiration dates' (not the BUD) are in February and May of 2017." (*Id.* (citation omitted).) Gray contends that "[t]he VDOC has not provided any evidence to support this as a BUD, and for the reasons noted above, it is unlikely that these compounded drugs will remain stable and effective over this period of time." (*Id.* at 12–13.) Finally, Gray identifies three instances where compounded pentobarbital, which is not a drug that the VDOC intends to use here, allegedly caused problems in an execution. (*Id.* at 13–14.)

Gray also contends that because he suffered "severe and protracted sexual abuse," he now "faces terrifying nightmares in which Mr. Gray continues to experience himself as a child, being raped." (*Id.* at 14; *see also* Lisak Decl. ¶¶ 13–14, ECF No. 17.) According to Gray and his expert, Dr. Lisak, the VDOC's lethal injection protocol "will cause Mr. Gray extreme terror, and play upon one of Mr. Gray's most significant and longstanding fears" of being paralyzed. (Br. Supp. Mot. Prelim. Inj. 15 (citing Lisak Decl. ¶ 16).) Dr. Lisak speculates that, based on Gray's description of his nightmares where he cannot move his legs or arms, Gray experiences "tonic immobility." (Lisak Decl. ¶ 14.) Dr. Lisak also states that "Gray exhibits many symptoms of Post-Traumatic Stress Disorder." (*Id.* ¶15.) According to Gray, he "will therefore experience the

8

psychological torture from his nightmare of being harmed while immobilized, a personalized torment that counsels in favor of an alternative method of execution." (Br. Supp. Mot. Prelim. Inj. 15.)

Gray argues that the VDOC has at least one alternative to the three-drug lethal injection protocol. He alleges that electrocution, in the legal sense, is not a known and available alternative because it is unconstitutional, and instead proposes a firing squad.

Finally, Gray argues that he "has been stymied in his attempts to learn any [of a host of purportedly] critical facts about the efficacy of drugs that the VDOC intends to use to execute him" by Virginia's "Secrecy Statute," contained in section 53.1–234 of the Code of Virginia ("Secrecy Statute"). (*Id.* at 24.) That statute states in pertinent part:

> The identities of any pharmacy or outsourcing facility that enters into a contract with the Department for the compounding of drugs necessary to carry out an execution by lethal injection, any officer or employee of such pharmacy or outsourcing facility, and any person or entity used by such pharmacy or outsourcing facility to obtain equipment or substances to facilitate the compounding of such drugs and any information reasonably calculated to lead to the identities of such persons or entities, including their names, residential and office addresses, residential and office telephone numbers, social security numbers, and tax identification numbers, shall be confidential, shall be exempt from the Freedom of Information Act (§ 2.2-3700 et seq.), and shall not be subject to discovery or introduction as evidence in any civil proceeding unless good cause is shown.

Va. Code Ann. § 53.1–234. Gray alleges that the Secrecy Statute is unconstitutional or, in the alternative "does not apply in this federal court proceeding adjudicating federal rights." (*Id.* at 25.)

The Court has considered the evidence presented by the parties and the testimony received during the evidentiary hearing, and as discussed below, finds that Gray falls far short of demonstrating entitlement to a preliminary injunction.

### III.   Facts

#### A.   Summary of the Evidence from Evidentiary Hearing

Gray produced three witnesses in support of his Motion for Preliminary Injunction and Temporary Restraining Order.[1] Larry D. Sasich, PharmD, MPH, FASHP, testified that midazolam is inappropriate for a use as an anesthetic drug and described the risks of compounded drugs generally. (*See generally* Prelim. Inj. Hr'g Tr. 13–44, 82–86, ECF No. 30.) Dr. Jonathan Groner, a medical doctor and Professor of Clinical Surgery, testified that execution by firing squad was "nearly instantaneous and painless" and that the current midazolam protocol or the electric chair has a far greater risk of causing pain and suffering than execution by firing squad. (Groner Decl. ¶ 7, 13, 15–17, ECF No. 18; *see generally* Prelim. Inj. Hr'g Tr. 110–27.) David Lisak, Ph.D., a psychologist who conducted a clinical interview of Gray in January 2016, testified that execution by lethal injection would be cruel and unusual for Gray because of reoccurring nightmares where he is paralyzed that stem from his childhood abuse. (*See generally* Prelim. Inj. Hr'g Tr. 147–54.)

The Commonwealth called four witnesses to address the issues raised by Gray. Dr. Daniel Buffington, an expert in clinical pharmacology and toxicology described the efficacy of 500 mg of midazolam as the first-drug in the three-drug protocol. (*See*

---

[1] The parties agreed to admit Gray's experts' previously filed declarations and supplement their testimony with specifically focused questions.

*generally id.* at 46–80.) A. David Robinson, the Chief of Corrections Operations for the VDOC, recounted the difficulty encountered by the VDOC in acquiring lethal injection drugs. He also explained the methodology the VDOC has employed for monitoring and controlling the potency of the compounded drugs at issue. (*See generally id.* at 87–109.) Dr. Frank Fuller, a VDOC pharmacist, detailed the procedure for storage and potency monitoring of the compounded drugs at issue. (*See generally id.* at 129–46.) Finally, Shane Wyatt, a chemist at the Virginia Department of Consolidated Laboratory Services, General Services Division ("VDCL"), described the tests he conducted on the compounded midazolam and compounded potassium chloride designated for use in this case, to ensure the integrity and continued potency of the drugs. (*See generally id.* at 155–68.)

Initially, the Court notes an absence of expert testimony quantifying the risk Gray actually faces in the current execution scheme.[2] Mere speculation is insufficient to support an Eighth Amendment claim. Gray's evidence fails to show that the VDOC's current three-drug lethal injection protocol "presents a risk that is *sure or very likely* to

---

[2] Gray's experts were more inclined to provide irrelevant information about midazolam's unsuitability as a general anesthetic in a medicinal procedure, rather than the efficacy of a 500 mg dose of midazolam in the lethal injection context. For example, the Court inquired of Dr. Sasich whether it was his "belief that the administration of 500 milligrams of midazolam would not be reasonably calculated to render the person unconscious?" (Prelim. Inj. Hr'g Tr. 39.) Dr. Sasich's responses were pure obfuscation:

> DR. SASICH: It certainly depends on the individual, the effect of the --
> THE COURT: Five hundred milligrams is not reasonably calculated, the average anesthesiologist?
> DR. SASICH: I don't think the average anesthesiologist would have prescribed 500 milligrams of midazolam.

(*Id.*)

cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." *Glossip v. Gross*, 135 S. Ct. 2726, 2736–37 (2015) (internal quotation marks omitted) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008)). In contrast, the Court finds the Defendants' evidence credible and compelling. It clearly demonstrates that any discomfort experienced by Gray in the execution process is unlikely to cause serious pain or suffering. Moreover, given the constraints placed upon the Commonwealth in obtaining other effective lethal injection drugs, Virginia appears to have implemented the most efficacious way for executing Mr. Gray's sentence.

### B.     Factual Background Relating to Lethal Injection

As an alternative to execution by electric chair, Virginia adopted lethal injection on January 1, 1995. Since then, Virginia has successfully executed 80 inmates by lethal injection. Virginia employs a three-drug protocol to perform an execution by lethal injection. (VDOC Operating Procedure 460 at 10–11, ECF No. 21–1.) Clearly, this method of execution was used by Virginia long before Gray committed the violent murders of the Harvey family in 2006. Virginia has also employed a three-drug protocol during the ensuing eleven years while Gray has been challenging his convictions and death sentence.

The first drug in Virginia's protocol renders the condemned inmate unconscious. As has been alleged in prior cases, *see, e.g., Prieto v. Clarke*, No. 3:15CV587–HEH, 2015 WL 5793903, at *1 (E.D. Va. Oct. 1, 2015); *Reid v. Johnson*, 333 F. Supp. 2d 543, 551 (E.D. Va. 2004), Gray primarily speculates that the first drug in Virginia's protocol

may be ineffective, subjecting him to intolerable pain from the administration of the second and third drugs.

In light of the pressure waged by death penalty opponents, it has become increasingly difficult to obtain the drugs Virginia traditionally used to render a prisoner unconscious during the initial stage of the execution process. For this reason, in recent years the VDOC has approved the use of midazolam and pentobarbital as permissible first-stage drugs in the protocol. Robinson explained that the VDOC has encountered difficulty obtaining either of these drugs from its traditional suppliers. (Prelim. Inj. Hr'g Tr. 91.) He testified that for the last Virginia execution, the VDOC had to obtain compounded pentobarbital from Texas as its first drug in the three-drug protocol. (*Id.* at 92.) Robinson noted that if Texas had not supplied the VDOC with the compounded pentobarbital, the VDOC had no other available source to acquire the necessary drugs for that execution. (*Id.*) Robinson attempted to obtain pentobarbital and sodium thiopental for Plaintiff's execution, but no pharmacy would supply him with these drugs. (*Id.* at 99.) Because death penalty opponents have made it difficult to obtain FDA-approved drugs customarily used in executions, Virginia has recently resorted to obtaining drugs from compounding pharmacies instead of traditional suppliers.

Robinson explained that after passage of the Secrecy Statute, the VDOC spoke with twenty to twenty-five pharmacies in Virginia about obtaining lethal injection drugs. (*Id.* at 93.) The VDOC was required to enter into a Memorandum of Understanding with a compounding pharmacy before the pharmacy agreed to provide the VDOC with the

13

necessary drugs. (ECF No. 21-2.) Total confidentiality about the pharmacy's identity

was an essential term of that agreement. (Prelim. Inj. Hr'g Tr. 95.)

### C.    Facts Pertaining to the Instant Compounded Drugs

By October 6, 2016,[3] Gray was aware of the specific drugs that the VDOC intends

to use to execute him:

1.    compounded midazolam hydrocholoride ("compounded
      midazolam") as the first drug in the protocol (intended to anesthetize
      Mr. Gray);
2.    manufactured roncuronium [sic] bromide as the second drug in the
      protocol (a paralytic drug administered to Mr. Gray to prevent him
      from moving and showing outward signs of distress while the lethal
      third drug is administered); and
3.    compounded potassium chloride as the third drug in the protocol,
      which will kill Mr. Gray by causing his heart to stop beating.

(Br. Supp. Mot. Prelim. Inj. 3.) The VDOC obtained two batches of compounded

midazolam and compounded potassium chloride from the compounding pharmacy.

Robinson himself picked up both of these batches of drugs. (Prelim. Inj. Hr'g Tr. 96.)

The VDOC has certified that the compounded drugs were prepared between August 1

and October 31, 2016, by a pharmacy that is licensed to operate in Virginia under the

direction of a licensed pharmacist. (ECF No. 15–6, at 4.) Proper chain of custody was

maintained at all times, and the transfers were accomplished in accordance with

instructions from the licensed pharmacist. (*Id.*) Dr. Fuller indicated that he received the

batches of compounded drugs and stored the drugs under manufacturer-required

temperatures. (Prelim. Inj. Hr'g Tr. 130.) Dr. Fuller and the compounding pharmacist

---

[3] Gray learned that the VDOC had obtained midazolam for his execution on October 4, 2016,
and on October 6, 2016 he learned that it was compounded midazolam. (ECF No. 15–6, at 7,
10.)

14

who made the drugs agreed that they should be stored at room temperature in order to prevent potential precipitate, which would render the drugs unsuitable for injection. (*Id.* at 131.) Dr. Fuller inspected the drugs and confirmed that they had no visible precipitate, were not cloudy, and that their bottles were sealed. (*Id.* at 132–34.)

For the first batch, the label for the bottle containing midazolam indicated that the "projected expiration date" was April 1, 2017 (ECF No. 21–3, at 1–3), and the label for the first bottle containing compounded potassium chloride stated that the "projected expiration date" was February 28, 2017 (ECF No. 21–4, at 1). Dr. Fuller explained that these bottles were not labeled with BUDs, in part, because the VDOC intended to test the drugs monthly to determine whether the drugs had deteriorated, alleviating the need for beyond use dates.[4] (Prelim. Inj. Hr'g Tr. 134–35.) Dr. Fuller agreed that compounded midazolam and compounded potassium chloride would be considered high-risk drugs if used for medicinal purposes and would have BUDs of twenty-four hours. (*Id.* at 140–41.) He further explained that these standards are not relied upon for the preparation of execution drugs. (*Id.* at 145.)

On October 26, 2016, Shane Wyatt received "two sealed containers," one of potassium chloride, and one of midazolam, that were tested for "[v]erification of labeled

---

[4] Dr Fuller also explained that the primary reason that the drugs were labeled with a projected expiration date rather than a beyond use date was that the Virginia Code required the label to have a projected expiration date. (Prelim. Inj. Hr'g Tr. 135.) That statute provides, in pertinent part: "The pharmacy . . . shall label each such drug with the drug name, its quantity, a *projected expiration date* for the drug, and a statement that the drug shall be used only by the Department for the purpose of carrying out an execution by lethal injection." Va. Code Ann. § 53.1–234 (emphasis added).

concentration for each container." (ECF No. 21–5, at 1.)[5] The label for the potassium

chloride stated that it was 250 mL of 2 mEq/mL potassium chloride and the label for the

midazolam stated that its concentration was 10 mL of 5 mg/mL midazolam. (*Id.*) The

VDCL's testing reflected that the compounded potassium chloride had a concentration of

1.97 plus or minus 0.006mEq/ML Chloride and 1.91 plus or minus 0.020 mEq/mL

Potassium, and the compounded midazolam was 4.47 plus or minus 0.77 mg/mL

midazolam. (*Id.*) Dr. Fuller testified that the tests demonstrated that the concentrations

were consistent both with their labels and with their commercially manufactured

counterparts. (Prelim. Inj. Hr'g Tr. 136.)

Robinson testified that the VDOC later obtained a second batch of drugs from the

compounding pharmacy containing one bottle of compounded midazolam and one bottle

of compounded potassium chloride. (Prelim. Inj. Hr'g Tr. 97.) For the second batch, the

label for the bottle containing midazolam indicated that "projected expiration date" was

May 1, 2017 (ECF No. 21–7), and the label for the bottle containing compounded

potassium chloride stated that the "projected expiration date" was May 1, 2017 (ECF No.

21–8). The VDOC sent this second batch, along with the initial batch that had already

been tested, to the VDCL for testing. On December 5, 2016, Wyatt received "four sealed

containers," two of potassium chloride and two of midazolam, that were tested for

"[v]erification of labeled concentration for each container." (ECF No. 21–6, at 1.) The

label for the previously tested potassium chloride stated that it was 250 mL of 2 mEq/mL

---

[5] The VDCL issued an initial certificate of analysis and then two amended certificates of analysis due to mathematical errors. Wyatt averred that there was no error with respect to the actual testing of the drugs. (Prelim. Inj. Hr'g Tr. 158–59.)

potassium chloride, and the VDCL's second test reflected that the compounded

potassium chloride had a concentration of 1.98 plus or minus 0.006mEq/ML Chloride

and 2.05 plus or minus 0.020 mEq/mL Potassium. (*Id.*) The new bottle of potassium

chloride was labeled as 250 ML of 2 mEq/mL, and the VDCL's test reflected that it

contained 1.99 plus or minus 0.006 mEq/mL Potassium and 2.08 plus or minus .020

mEq/mL Potassium. (*Id.*) The label for the previously tested midazolam stated that its

concentration was 10 mL of 5 mg/mL midazolam, and the VDCL's second test reflected

that the compounded midazolam was 5.07 plus or minus 0.77 mg/mL midazolam. (*Id.*)

The label for the second bottle of midazolam indicated that it contained 10 mL of 5

mg/mL midazolam, and the VDCL's test reflected that the concentration was 5.00 plus or

minus .077 mg/mL midazolam. (*Id.*) Dr. Fuller testified that the tests demonstrated that

the concentrations were consistent both with their labels and with their commercially

manufactured counterparts. (Prelim. Inj. Hr'g Tr. 136.) Wyatt confirmed that the tests

matched the bottles' labeled concentrations. (*Id.* at 163.)

Wyatt testified that he conducted a full scan on these bottles for total concentration

and to confirm the identity of the contents. (*Id.* at 156.) He inspected all four bottles of

compounded drugs for any cloudiness or precipitate and noted that the substances

appeared clear. (*Id.* at 163.) Wyatt testified that his lab does not test for sterility or

endotoxins. (*Id.* at 164.) He explained, however, that any impurities or other substances

17

mixed in the compound would have resulted in a greater presence of spikes on the graph

created by the mass spectrometer than what he observed.[6]   (*Id.* at 159.)

### D.     Effects of Midazolam

The VDOC will use 500 mg of midazolam as its first-stage drug in the three-drug

lethal injection protocol.  Midazolam is used as a sedative.  It is a central nervous system

and respiratory depressant.  Dr. Sasich, Dr. Buffington, and Dr. Groner all agreed that

much smaller amounts of midazolam are used for medicinal or therapeutic purposes.

Midazolam is "dose dependent," meaning that the more an individual is administered, the

greater the effect will be, leading to more progressive levels of sedation.  Five milligrams

is considered a high dosage for medicinal or clinical use.  Doses as small as 10 mg to 20

mg have resulted in death.  Dr. Buffington explained that "[t]here would be absolutely

no therapeutic utility or rationale to use" 500 mg of midazolam "for a clinical purpose."

(Prelim. Inj. Hr'g Tr. 54.)  Dr. Buffington noted that administration of 500 mg of

midazolam would result in "respiratory failure" and a "certainty of death."  (*Id.* at 52,

54.)  He further explained that there is no data to support the idea that midazolam has a

so-called ceiling effect.  (*Id.* at 55, 69.)

Dr. Buffington agreed that midazolam is neither approved by the FDA or other

medical licensing agencies for use as a general anesthetic, nor is it indicated in reference

books for that purpose.  (*Id.* at 61, 64.)  He explained that midazolam would not be used

---

[6] Robinson testified that the VDOC decided to conduct regular testing of the drugs to ensure their integrity and potency. (Prelim. Inj. Hr'g Tr. 96–97.) Gray's expert, Dr. Sasich, who has testified in a number of challenges to executions, noted that this is the first state-conducted testing of execution drugs he has seen. (*Id.* at 31.) Dr. Sasich also admitted that to his knowledge no state requires testing lethal injection drugs prior to use. (*Id.* at 18.)

alone during a clinical procedure to induce general anesthesia because of its significant, life-threatening, adverse side effects at the doses that would be required. (*Id.* at 61, 66.) Dr. Buffington explained that at higher doses midazolam causes life-threatening respiratory depression, "which is consistent with the desired application in this particular case." (*Id.* at 62.)

Dr. Buffington also explained that he would not expect that a patient would be conscious during depression of respiratory symptoms, because "if you're going to say that the drug is having one effect, you would expect it to have all the effects. So if you've got a serious profound respiratory depression, you've also got serious sedation and significant anesthetic effects all simultaneous. So, I would not expect the respiratory depression effect to be something the person would be cognizant of." (*Id.* at 63.) Because midazolam suppresses the respiratory system, any signs of respiratory distress such as coughing or gasping would be normal reflexes of respiratory distress, but these signs do not mean the person is conscious. (*Id.* at 70.)

Dr. Buffington steadfastly confirmed that a dose of midazolam well below 500 milligrams "would render an individual unconscious with anterograde amnesia and insensitive to noxious stimuli." (*Id.* at 55.)[7] He further acknowledged that, although midazolam is classified as a "short acting drug," it would remain effective beyond the duration of the lethal injection procedure. (*Id.* at 62–63.)

---

[7] Buffington further testified that midazolam administered at a 500 mg does "is clearly capable of inducing general anesthesia . . . ." (Prelim. Inj. Hr'g Tr. 67.)

### E. The Compounding Pharmacy

Dr. Buffington explained that drugs are compounded "routinely" and that compounded drugs are as efficacious as their commercially manufactured counterparts. (*Id.* at 50.) Robinson testified that the VDOC obtained the compounded midazolam and compounded potassium chloride from a licensed pharmacy and that the compounds were made by a licensed pharmacist. (*Id.* at 94.) The compounding pharmacy selected by the VDOC had no FDA or Virginia Department of Pharmacy regulatory infractions. (*Id.*) While Gray's expert espouses a host of hypothetical risks that could result from a compounding pharmacy's preparation of drugs, Dr. Buffington rejoined that he would have confidence in the integrity of compounded drugs made in a licensed pharmacy, that the drugs would be sterile, and that the pharmacy prepared the drugs correctly and in compliance with appropriate standards. (*Id.* at 74–76.) Dr. Buffington noted that the FDA or state boards of pharmacy do not set standards for execution drugs. (*See id.* at 59.) He also explained that concerns about drug preparation, storage, and compliance with beyond use dates are concerns for clinical applications, to avoid potential harm patients, not for correctional applications. (*See id.* at 71, 73–74.) He explained that for corrections applications, drugs are used for their adverse side effect; "the end goal of the combined administration of these medications is worse than any potential adverse side effect" from improper storage. (*Id.* at 73–74.)

### F. Virginia's Specific Protocol

Robinson testified that he has worked for the VDOC for thirty-five years and has observed thirteen executions. (*Id.* at 88.) The execution team practices once a month,

regardless of whether an execution is scheduled. (*Id.*) When an execution date has been

set, the team practices twice a month and once a week within a month of the execution.

(*Id.*) Robinson explained that the team simulates the process by conducting a "dry-run"

of both the electric chair and lethal injection protocols. (*Id.* at 89.) A consciousness test

is an integral part of that regimen. (*Id.*) This consciousness test ensures that the

individual has no reaction to noxious stimuli. (*Id.* at 89–90.) Robinson explained that

two experienced medical professionals, who have participated in prior executions, are a

part of the team and ensure the proper insertion of the IV. (*Id.* at 90.) Robinson testified

that in the VDOC's execution of Alfredo Prieto in October 2015, a compounded drug,

pentobarbital, was the first drug administered in the three-drug lethal injection. (*Id.* at

92–93.) Robinson observed that execution and noted that there were no complications.

(*Id.* at 93.)

### G.     Proffered Alternative Method of Execution

Dr. Groner testified that, in his opinion, execution by firing squad would result in

"nearly instantaneous and painless" death. (Groner Decl. ¶ 7, ECF No. 18.) According

to Utah's protocol, the firing squad would aim at a target placed over the individual's

heart. (*Id.* ¶ 9.) A properly aimed bullet would tear the left ventricle, causing cessation

of the blood to the brain, resulting in unconsciousness within seconds. Death would

follow within three to four minutes. (*Id.* ¶ 10.) Dr. Groner agreed that an individual

would be conscious when the bullet hit his chest. (Prelim. Inj. Hr'g Tr. 120.) Dr. Groner

admitted that he could not quantify with any degree of certainty how much pain an

individual would experience. (*Id.* at 120–21.) Dr. Groner also admitted that if the bullet

missed the target, the individual "could suffer" and would experience an "agonizing death." (*Id.* at 121.) Dr. Groner, however, offered no convincing testimony as to why being shot could not be extremely painful.

Moreover, Robinson testified that the VDOC could not carry out an execution by firing squad. Because VDOC employees have not been trained in that methodology, the VDOC does not have a chamber in which to conduct such an execution, and the VDOC has not explored the cost of such a procedure. (*Id.* at 99–100.) Robinson explained that the VDOC is not authorized to use a manner of execution that has not been approved by the Virginia General Assembly. (*Id.* at 100.)

## IV. Standard for a Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Glossip v. Gross*, 135 S. Ct. 2726, 2736–37 (2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Fourth Circuit Court of Appeals has clearly articulated an analytical framework for applying the teachings of *Winter*. *See Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). Gray, as the party seeking a preliminary injunction, bears the burden of establishing that each factor supports granting the injunction. *Real Truth*, 575 F.3d at 346. Each factor must be demonstrated by a "clear showing." *Winter*, 555 U.S. at 22. Failure to satisfy any one

of the relevant factors mandates denial of the preliminary injunction. *Real Truth*, 575 F.3d at 346. As explained below, Gray fails on all four fronts.

## V. No Likely Success on the Merits and No Showing of Irreparable Harm

The Supreme Court has emphasized that "because it is settled that capital punishment is constitutional, '[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'" *Glossip v. Gross*, 135 S. Ct. 2726, 2732–33 (2015) (alterations in original) (quoting *Baze v. Rees*, 553 U.S. 35, 47 (2008)). Because "[s]ome risk of pain is inherent in any method of execution—no matter how humane," the Eighth Amendment "does not demand the avoidance of all risk of pain in carrying out executions." *Baze*, 553 U.S. at 47. More specifically, "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id.* at 50. As another district court has astutely noted: "The pharmaceutical manufacturers' withdrawal of the best drugs from use in executions does not end capital punishment." *First Amendment Coal. of Az. v. Ryan*, --- F. Supp. 3d ----, 2016 WL 2893413, at *5 (D. Az. May 18, 2016).

"[P]risoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is *sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." *Glossip*, 135 S. Ct. at 2737 (internal quotation marks omitted) (quoting *Baze*, 553 U.S. at 50). "A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a

demonstrated risk of severe pain." *Id.* (quoting *Baze*, 553 U.S. at 61). The inmate must also show that "the risk is substantial when compared to the known and available alternatives." *Id.* (quoting *Baze*, 553 U.S. at 61). The burden rests with Gray to "plead and prove" both prongs of the test. *Id.* at 2739; *see Brooks v. Warden, Comm'r Ala. Dep't of Corr.*, 810 F.3d 812, 819 (11th Cir. 2016) (citation omitted), *cert. denied*, 136 S. Ct. 979 (2016).

The Supreme Court has rejected a similar Eighth Amendment challenge to the three-drug protocol that the VDOC will use here to execute Gray. *Glossip*, 135 S. Ct. at 2737–38 (affirming district court's denial of preliminary injunction because inmate failed to establish that the use of midazolam was sure or very likely to cause needless suffering). Although Gray makes much of the fact that the VDOC will use *compounded* midazolam, he fails to demonstrate that compounded midazolam is pharmacologically inferior to non-compounded midazolam. In fact, persuasive evidence in the case at hand is to the contrary.

### A.    Midazolam as the First Drug in Protocol

Initially, Gray argues that midazolam "is *not an anesthetic* at all" (Br. Supp. Mot. Prelim. Inj. 1), and that "midazolam *in any form* is wholly unsuited to the task of anesthetizing [him]" (*Id.* at 6), because it "poses a recognized and substantial risk of causing [him] severe pain." (*Id.*) Gray supports his arguments with the following contentions:  (1) midazolam is an anxiety medicine, and while it "can render inmates initially unconscious, it cannot produce and maintain anesthesia" (*Id.* at 8–9 (footnote omitted)); (2) midazolam has a "ceiling effect" (*Id.*); (3) midazolam itself could cause

24

Gray pain (*Id.*); and, (4) three inmates who were executed using midazolam in 2014 and 2015 twitched or gasped for air. (*Id.* 8–9.)

The United States Supreme Court and several appellate courts have uniformly rejected challenges to lethal injection protocols that use midazolam as the first drug in a three-drug lethal injection protocol because the plaintiffs had not established that it poses a constitutionally unacceptable risk of pain. *See Glossip*, 135 S. Ct. at 2731; *Grayson v. Warden*, --- F. App'x ----, 2016 WL 7118393, at *4–5 (11th Cir. Dec. 7, 2016) (explaining that "Supreme Court and 'numerous other courts' have concluded that midazolam is an adequate substitute for pentobarbital as the first drug in a three-drug lethal injection protocol" (citing *Brooks*, 810 F.3d at 822–24))). Based on the evidence in the immediate case, the Court fails to discern any reason to conclude otherwise.

Gray acknowledges that the United States Supreme Court has categorically rejected each of these arguments. *See Glossip*, 135 S. Ct. at 2731; *see also Brooks*, 810 F.3d at 818–22 (rejecting similar arguments after *Glossip*). Nevertheless, counsel argues that the "Supreme Court has not 'approved' the use of midazolam in three-drug protocol lethal-injection executions." (Br. Supp. Mot. Prelim. Inj. 7 n.4.) While the Court does not suggest that the Supreme Court has endorsed midazolam's constitutionality in all applications, Gray cannot ignore that in similar, if not identical, challenges to the use of the drug, the Supreme Court found those arguments unpersuasive and declined to order a stay of execution. *See Glossip*, 135 S. Ct. at 2726, 2740–44. The Supreme Court explicitly rejected Gray's arguments that midazolam could not maintain anesthesia and that midazolam had a "ceiling effect."

Indeed, the Supreme Court rejected the testimony of Gray's own witness, Dr.

Sasich, that midazolam was "powerful enough to induce unconsciousness," but "too

weak to maintain unconsciousness and insensitivity to pain." *Id.* at 2740–41. Instead, the

Supreme Court found credible testimony that 500 mg of midazolam would render a

person insensate to pain. *Id.* at 2741. The Supreme Court further found Dr. Sasich's

theory about midazolam having a "'ceiling effect" when administered in high doses

"speculative" and unconvincing. *Id.* at 2743–44. The Supreme Court also found no

merit in the argument that midazolam itself can cause paradoxical reactions. *Id.* at 2740

n.3. Having weighed the testimony of Dr. Sasich and Dr. Buffington, the Court is firmly

convinced that a 500 mg injection of midazolam would render a person insensate to pain.

Dr. Sasich's testimony is inconsistent with the weight of credible authority.

The Supreme Court also rejected Gray's fourth argument, that "[Clayton]

Lockett['s execution in Oklahoma] and Arizona's July 2014 execution of Joseph Wood

establish that midazolam is sure or very sure to cause serious pain." *Id.* at 2745. The

Supreme Court explained: "When all circumstances are considered, the Lockett and

Wood executions have little probative value for the present purposes." (*Id.* at 2746.) The

Court finds the same holds true here.[8] The Supreme Court pointed out that as of June 29,

---

[8] As the Supreme Court explained:

> Lockett was administered only 100 milligrams of midazolam, and Oklahoma's
> investigation into that execution concluded that the difficulties were due primarily
> to the execution team's inability to obtain an IV access site. And the Wood
> execution did not involve the protocol at issue here. Wood did not receive a
> single dose of 500 milligrams of midazolam; instead, he received fifteen 50-
> milligram doses over the span of two hours. And Arizona used a different two-
> drug protocol that paired midazolam with hydromorphone, a drug that is not at

26

2015: "Aside from the Lockett execution, 12 other executions have been conducted using the three-drug protocol at issue here, and those appear to have been conducted without any significant problems." (*Id.* at 2745–46.)

Counsel for Gray now adds that Ronald Bert Smith, executed in Alabama several weeks ago, "struggled for breath and heaved and coughed and clenched his left fist" after receiving the injection of midazolam. (Br. Supp. Mot. Prelim. Inj. 1 (internal quotation marks omitted) (citation omitted).) However, the fact that Smith struggled for breath, heaved, coughed, and clenched his fist, without more, falls far short of showing that midazolam "is *sure or very likely* to cause serious illness and needless suffering." *Glossip*, S Ct. at 2737 (citation omitted); *see also id.* at 2733 (citation omitted) (recognizing that "some risk of pain is inherent in any method of execution" and "that the Constitution does not require the avoidance of all risk of pain").[9]

Despite that fact that almost every argument advanced by Gray is contrary to settled Eighth Amendment jurisprudence, he has been afforded the opportunity to present evidence to support his allegations. *See id.* at 2740 (emphasis added) (explaining that "an inmate challenging a protocol bears the burden to show, based on evidence presented to the court, that there is a substantial risk of severe pain"). Even considering the subtle variances in Gray's contentions from those offered by the plaintiff in *Glossip*, he still

---

issue in this case. When all of the circumstances are considered, the Lockett and Wood executions have little probative value for present purposes.

*Glossip*, 135 S. Ct. at 2746 (internal citations omitted) (footnote omitted).

[9] Indeed, Smith's reaction appears to be consistent with signs of respiratory distress identified during Gray's evidentiary hearing.

fails to make any showing, much less a clear showing, that midazolam poses "an objectively intolerable risk of harm." *Id.* at 2737 (citing *Baze*, 553 U.S. at 50; *see also id.* at *Glossip*, 135 S. Ct. at 2740–46.

The evidence presented by Defendants establishes that the administration of 500 mg of midazolam can render a prisoner unconscious and insensate to pain during the remainder of the three-drug protocol. The evidence demonstrates that even 500 mg of midazolam used alone will result in a "certainty of death." (Prelim. Inj. Hr'g Tr. 54.)

Gray's allegations about a ceiling effect and the possibility that he could experience seizures or paradoxical effects are similarly conjectural. Gray's own witness acknowledged that there "might be" a ceiling effect, but it has never been empirically confirmed. (*Id.* at 36.) Dr. Buffington convincingly testified that the whole theoretical phenomenon of a ceiling effect with midazolam would be inconsequential because the individual would be deeply sedated prior to reaching that level. (*Id.* at 55–56.) Gray also puts forth no cogent evidence that he could experience seizures or "paradoxical reactions," or that those seizures or reactions in and of themselves indicate that the individual was experiencing needless suffering. *See Warner v. Gross*, 776 F.3d 721, 730, 732, 735–36 (10th Cir. 2016) (rejecting ceiling effect argument and paradoxical effects argument about midazolam as "speculative").

On this record, Gray fails to establish a substantial likelihood that Virginia's use of 500 mg of midazolam as the first drug in its lethal injection protocol "is *sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." *Glossip*, 135 S. Ct. at 2737 (internal quotation marks omitted)

28

(quoting *Baze*, 553 U.S. at 50); *see Grayson*, 2016 WL 7118393, at *5 (explaining that prior decisions about the use of midazolam "make it clear that it is not just unlikely that [Gray] will be able to make the showing required by the first prong of *Glossip*, but in fact it is virtually certain that he will be unable to do so"). Thus, he fails to demonstrate any likelihood of success on the merits with respect to his general challenge to midazolam as the first drug in the lethal injection protocol or that he is likely to suffer irreparable harm from its use.

### B.    Compounded Midazolam and Compounded Potassium Chloride

Gray next contends that midazolam and potassium chloride prepared by a compounding pharmacy "adds an additional layer of intolerable risk." (Br. Supp. Mot. Prelim Inj. 6.) Again Gray fails to meet his burden of persuasion. Although he posits a list of potential hazards that may result from using compounded forms of midazolam and potassium chloride, he again fails to make any showing, much less a clear showing, that the drugs pose "an objectively intolerable risk of harm." *Glossip*, 135 S. Ct. at 2737 (internal quotation marks omitted) (quoting *Baze*, 553 U.S. at 50). Gray's attempt to suggest that the compounded drugs here are more dangerous than FDA-approved drugs is unsupported by the evidence.

The United States Court of Appeals for the Fifth Circuit recently rejected nearly identical arguments by a Texas death row inmate that "compounded drugs are unregulated and subject to quality and efficacy problems." *Ladd v. Livingston*, 777 F.3d 286, 289 (5th Cir. 2015); *see also Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1264–66 (11th Cir. 2014) (rejecting similar challenge to a compounded drug). The court

29

concluded that such arguments are "essentially speculative," and "speculation cannot substitute for evidence that the use of the drug is *sure or very likely* to cause serious illness and needless suffering." *Ladd*, 777 F.3d at 289 (quoting *Brewer v. Landigran*, 562 U.S. 996, 996 (2010)). The Fifth Circuit explained that to succeed, an inmate must "offer some proof that the state's own process—that its choice of pharmacy, that its lab results, that the training of its executioners, and so forth, are suspect." *Id.* (citing *Whitaker v. Livingston*, 732 F.3d 465, 468 (5th Cir. 2013)). The court went on to observe that Texas was able to conduct its last fourteen executions with "a single-drug pentobarbital injection from a compounded pharmacy . . . without significant incident." *Id.* at 290. This Court previously refused to halt the execution of a Virginia inmate, Alfredo Prieto, whose lethal injection protocol used a compounded drug as its first ingredient. *See Prieto v. Clarke*, No. 3:15CV587–HEH, 2015 WL 5793903 (E.D. Va. Oct. 1, 2015). Prieto's execution using the compounded drug was completed without incident.

Gray and his expert, Dr. Sasich, question whether a compounding pharmacy could maintain the optimal standards necessary to produce midazolam that would retain its effectiveness for the period of time represented on the midazolam bottle. That disbelief, however, fails to substitute for persuasive evidence.[10]

---

[10] In the hours before his execution, Alfredo Prieto's expert asserted that compounded pentobarbital would have at most a seventy-two hour effective potency and thus the much older compounded pentobarbital proposed for Prieto's execution would not render Prieto insensitive to the second and third drugs for his execution. These assertions about the compounded drug were completely wrong as there were no complications with Prieto's execution.

Gray and Sasich recounted a number of possible problems that could conceivably occur during the compounding process, including contamination and not maintaining the compounded drugs or their ingredients in the appropriate conditions. Again, this mere "speculation cannot substitute for evidence that the use of the drug is *sure or very likely* to cause serious illness and needless suffering." *Ladd*, 777 F.3d at 289 (quoting *Brewer*, 562 U.S. at 996). Gray has identified no deficiencies in Virginia's procurement of the drugs in question that would support a viable Eighth Amendment claim. *See id.* (citing *Whitaker*, 732 F.3d at 468). Hypotheticals are not sufficient to warrant a stay. *See id.*, 777 F.3d at 289.

To the contrary, the evidence before the Court reflects that the VDOC selected a licensed pharmacy and a licensed pharmacist to make the compounded drugs. Moreover, the compounded midazolam and potassium chloride have been tested by the VDCL. The testing confirms that each bottle contains the substance and concentration that each label reflects and that the substance meets the concentration level of comparable manufactured drugs. The presence of contaminants in the compounded drugs would have been revealed in the VDCL's test results. Compounded drugs are utilized routinely, even in clinical settings, and are just as efficacious as their manufactured counterparts. Gray fails to point to any instance where a state has unsuccessfully used compounded midazolam or compounded potassium chloride in the execution context.

Gray also contends that high-risk drugs such as those at issue have BUDs of twenty-four hours at room temperature. He also points out that the high-risk drugs here are being maintained at room temperature but have expiration dates that far exceed

31

twenty-four hours.  Gray fails to supply any probative evidence that Virginia's

maintenance of the drugs at room temperature or beyond twenty-four hours is "*sure or*

*very likely* to cause serious illness and needless suffering." *Glossip.* 135 S. Ct. at 2737

(quoting *Baze*, 553 U.S. at 50).  To the contrary, the VDOC tested the compounded drugs

and found that they have retained their labeled concentration.[11]

Simply put, Gray puts forth no evidence that compounded drugs subject him to "a

substantial risk of serious harm." *Id.* (quoting *Baze*, 553 U.S. at 50).  As such, Gray fails

to a make a clear showing that he is likely to succeed on the merits or suffer irreparable

harm.[12]

### C.    Lethal Injection Protocol As it Relates to Gray Individually

Gray's challenge to the use of the three-drug lethal injection protocol also is

premised on the allegation that its use will be unconstitutional as applied to him because

he suffers from psychological issues that "would create particular fear and suffering

---

[11] Gray also fails to make any showing that improper preparation or handling of midazolam or potassium chloride by either the compounding pharmacy or the VDOC will impact its effectiveness for the correctional purpose of *execution*. Instead, the evidence demonstrates that improper preparation or storage and beyond use dates are concerns when these drugs are used in a clinical context for therapeutic purposes. Moreover, to the extent any accidental mishandling might have occurred, "[t]he risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review." *Reid v. Johnson*, 333 F. Supp. 2d 543, 553 (E.D. Va. 2004) (quoting *Campbell v. Wood*, 18 F.3d 662, 687 (9th Cir. 1994)).

[12] Gray's arguments focus on compounded midazolam. Gray wholly fails to identify, and the Court fails to discern, how compounded potassium chloride "presents a risk that is *sure or very likely* to cause serious illness and needless suffering, and give rise to *sufficiently imminent* dangers." *Glossip*, 135 S. Ct. at 2737 (internal quotation marks omitted) (quoting *Baze*, 553 U.S. at 50). Potassium chloride is the third drug in the lethal injection protocol and is used to induce cardiac arrest. At most, Gray and Dr. Sasich vaguely suggest that the combination of two compounded drugs "creates an additional layer of risk that the drugs will cause Mr. Gray immediate harm and pain." (Sasich Decl. ¶ 8, ECF No. 16.) This is insufficient to meet his burden. Gray will be insensate by the time the potassium chloride is administered.

relating to paralysis and unconsciousness." (Lisak Decl. ¶ 10, ECF No. 17.)  Dr. Lisak

speculates that Gray may have Posttraumatic Stress Disorder ("PTSD") based on Gray's

statements that he suffers from nightmares in which he is paralyzed.  Dr. Lisak proffers

that the three-drug protocol's paralyzing effect may trigger Gray's PTSD-like symptoms.

However, Dr. Lisak acknowledged that he had failed to address his concerns that Gray

may have PTSD with the mental health professionals treating Gray at his place of

incarceration.  (*Id.* at 151.)

  The evidence before the Court is wholly insufficient to demonstrate that Virginia's

use of the three-drug lethal injection protocol creates a "substantial risk of serious harm"

as applied to Gray.  Dr. Lisak's testimony is entirely speculative and unpersuasive, as he

fails to quantify the likelihood that Gray would experience constitutionally significant

harm.  *See Arthur*, 840 F.3d at 1309–12 (holding that as-applied challenge failed where

inmate was unable to produce anything more than speculation that midazolam, as applied

to him, would cause a heart attack before full sedation).  The evidence before the Court

"necessitates the conclusion that any estimation of what side effects are likely to occur

and the severity of those side effects is wholly speculative." *Coeey v. Strickland*, 604

F.3d 939, 944 (6th Cir. 2010) (internal quotation marks omitted) (citation omitted).

Speculation of this nature "cannot meet the standard of a sure or very likely risk of

serious pain . . . that is substantial when compared to the known and available

alternatives." *Id.* (internal quotation marks omitted) (citation omitted).

  Alternatively, Gray fails to produce evidence that there are known and available

alternatives that are feasible, readily implemented, and would significantly reduce a

substantial risk of severe pain as applied to him. *See Gissendaner v. Comm'r, Ga. Dep't of Corr.* 779 F.3d 1275, 1283 (11th Cir. 2015) (finding fatal for the purposes of Fed. R. Civ. P. 12(b)(6) an inmate's failure to identify alternative method "that would substantially reduce the risks she identifies based on her gender, obesity, and possible sleep apnea"). As discussed below, the only available alternative that Gray offers is a firing squad, a method that is neither available nor likely to substantially reduce the risks Gray identifies based on his alleged psychological fear of being paralyzed.[13]

### D. Gray Fails to Suggest a Known and Available Alternative Method of Execution

In addition to the above failings, Gray is unlikely to succeed on the merits of his Eighth Amendment claim because he has failed to shoulder his responsibility to suggest an alternative method of execution that is "known and available" as well as "feasible, readily implemented, and in fact significantly [likely to] reduce a substantial risk of severe pain.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 52).

In an attempt to carry this substantial burden, Gray alleges that the Commonwealth "ha[s] refused to provide a constitutional execution method," and he proffers an alternative beyond Virginia's execution statute—the firing squad.[14] (Br. Supp. Mot. Prelim. Inj. 19.)

---

[13] In his Reply, Gray argues that Defendants only discussed each risk factor separately, not in the aggregate, and that in the aggregate, the various factors will cause's Gray's execution to be cruel and unusual. (Pl.'s Reply Br. 3–4, ECF No. 26.) The Court is dissuaded by this argument. Even considered in the aggregate, Gray has put forth no quantifiable risk from the VDOC's three-drug lethal injection protocol.

[14] Gray also suggests in passing that the Commonwealth could use "a single-dose lethal injection protocol using barbiturates such as pentobarbital or sodium thiopental, as other states are

Gray's principal assertion that both of Virginia's statutorily provided methods of execution—lethal injection and electrocution—are unconstitutional contravenes settled precedent and is without merit. As an initial matter, Gray does not contend that lethal injection is *per se* unconstitutional. Instead, he merely challenges Virginia's current protocol. As discussed above, the Court finds that Gray is unlikely to prevail on his claim that the Commonwealth's proposed use of compounded midazolam and potassium chloride violates his Eighth Amendment right to be spared from cruel and unusual punishment. Moreover, the Court finds that Gray's argument that electrocution is unconstitutional defies over a century of settled case law to the contrary.

The Supreme Court first upheld electrocution as a constitutionally permissible method of execution in *In re Kemmler*, 136 U.S. 436, 447 (1890). Though the Court did not decide that case under the Eighth Amendment—instead analyzing the claim under the Fourteenth Amendment—*In re Kemmler* has been cited numerous times, both before and after the Eighth Amendment was incorporated against the states in *Robinson v. California*, 370 U.S. 660 (1962), for the proposition that electrocution remains a

---

increasingly adopting." (Br. Supp. Mot. Prelim. Inj. 16 n.7.) Robinson testified that the VDOC attempted to obtain either pentobarbital or sodium thiopental for use in Gray's execution, but was unsuccessful in that effort. The Eleventh Circuit's analysis on a nearly identical assertion is persuasive here: "(1) 'the fact that the drug[s] . . . w[ere] available in [other states] at some point . . . does not, without more, make it likely that it is available to [Virginia] now'; and (2) '[Gray] ha[s] not shown that there is now a source for pentobarbital that would sell it to the [VDOC] for use in executions.'" *Arthur*, 840 F.3d at 1300 (quoting *Brooks*, 810 F.3d at 819–220). Given Gray's inability to provide a source for pentobarbital or sodium thiopental that would be willing to sell either drug to the VDOC for use in executions, the Court concludes that both drugs are unavailable. As such, Gray's attempt to point to another lethal injection protocol does not satisfy *Glossip*'s requirement that he provide a "known and available" alternative method of execution.

constitutional method of execution.[15]  And the Supreme Court has never reversed or

distinguished its decision, despite being afforded numerous opportunities to do so.

Gray argues through anecdotal accounts and the testimony of his expert witness,

Dr. Groner, that the Court should reverse the polarity of the law by holding that

electrocution violates the Eighth Amendment.  As the Supreme Court has noted, its

"decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of

whether subsequent cases have raised doubts about their continuing vitality." *Hohn v.

United States*, 524 U.S. 236, 252–53 (1998).  The Supreme Court's decision in *In re

Kemmler* and subsequent refusal to overrule it remains binding on this Court, and this

Court lacks the authority to find otherwise.[16]

---

[15] *See e.g.*, *Glossip*, 135 S. Ct. at 2732; *Baze*, 553 U.S. at 48–49; *McCleskey v. Kemp*, 481 U.S. 279, 299 (1987); *Rummel v. Estelle*, 445 U.S. 263, 288 (1980) (Powell, J., dissenting); *Ingraham v. Wright*, 430 U.S. 651, 667 (1977); *Gregg v. Georgia*, 428 U.S. 153, 170, 178 (1976); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 474–76 (1947); *Poyner v. Murray*, No. 93-6052, 1993 WL 13119345, at *1–2 (4th Cir. Jan. 19, 1993), *cert. denied*, 508 U.S. 931 (1993); *Martin v. Commonwealth*, 221 Va. 436, 439 (1980).

[16] Gray's argument that *In re Kemmler* is inapplicable under current Supreme Court precedent is unavailing as the Court referenced the constitutionality of electrocution in both *Glossip* and *Baze*. *See Glossip*, 135 S. Ct. at 2732 ("In *In re Kemmler* . . . . , the Court rejected a challenge to the use of the electric chair.  And the Court did not retreat from that holding even when presented with a case in which a State's initial attempt to execute a prisoner by electrocution was unsuccessful. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463–64 (1947) (parallel citation omitted)); *Baze*, 553 U.S. at 48–49 ("We carried [the principle that forbidden punishments included those where there was a deliberate infliction of pain for the sake of pain] further in *In re Kemmler*.  There we rejected an opportunity to incorporate the Eighth Amendment against the States in a challenge to the first execution by electrocution to be carried out by the State of New York.  In passing over that question, however, we observed: 'Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution.  It implies there something inhuman and barbarous, something more than the mere extinguishment of life.'") (citation omitted)).

Even if the Court were to re-assess the constitutionality of electrocution, it would find that Gray is not substantially likely to prevail on the merits of his claim. As the Supreme Court noted in *Baze*, "it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated." *Baze*, 553 U.S. at 53. Alabama, Arkansas, Florida, Kentucky, Oklahoma, South Carolina, Tennessee, Virginia, and the federal government have all statutorily authorized electrocution as a method of execution,[17] demonstrating that this method is widely practiced in many jurisdictions that enforce capital punishment. That some states have chosen to depart from electrocution in favor of other methods—and that Georgia and Nebraska have found it unconstitutional under their respective state constitutions—is irrelevant to this analysis.

Moreover, Gray has failed to satisfy his burden of showing that he is likely to succeed on the merits of his claim that death by electrocution carries a "risk that *is sure or very likely* to cause serious illness and needless suffering." *Glossip*, 135 S. Ct. at 2737 (citation omitted). Gray's reference to eyewitness accounts only demonstrate that the physical effects of electrocution—namely burn marks, catching on fire, and smoke rising from the points of contact with the electrodes—may be visually disturbing to those witnessing the execution. (Br. Supp. Mot. Prelim. Inj. 15–17.) They do not provide evidence that the condemned inmates were conscious or able to feel these effects before dying. And Dr. Groner's testimony does not controvert this. Instead, he merely notes that "the evidence *fails to show* that inmates are rendered instantly senseless by the flow

---

[17] Ala. Code § 15–18–82; Ark. Code Ann. § 5–4–617; Fla. Stat. § 922.105; Ky. Rev. Stat. § 431.220; 22 Okla. Stat. § 1014; S.C. Code. Ann. § 24–3–530; Tenn. Code Ann. § 40–23–114; Va. Code Ann. § 53.1–234; 18 U.S.C. § 3596.

of electricity through the scalp electrode." (Groner Decl. ¶ 17.)[18] Absent evidence to the contrary—namely, that electrocution fails to render the condemned unconscious and insensate—the Court would be unable to conclude that electrocution creates a "substantial" or "objectively intolerable risk of harm." *Glossip*, 135 S. Ct. at 2737 (citations omitted).

Because the Court finds that Gray is unlikely to satisfy the first prong of the *Glossip* analysis with respect to Virginia's lethal injection protocol and that, in the alternative, the Commonwealth has already provided him with a constitutionally "known and available" alternative method of execution by electrocution, the Court need not proceed in its analysis beyond the confines of Virginia's execution statute to consider a further alternative method of execution. Put succinctly, Virginia has provided Gray with two constitutional methods of execution. Gray is "not free to simply disregard those methods (and substitute his own) without satisfactorily establishing that those methods violate the constitutional command barring cruel and unusual punishment." *Arthur*, 840 F.3d at 1317. "Absent a showing that [the Commonwealth's] chosen methods of execution present an unconstitutional risk of severe pain, [Virginia] is under no obligation to deviate from its widely accepted, presumptively constitutional methods in favor of [Gray's] retrogressive alternative." *Id.* at 1318.

Nevertheless, as an alternative and independent ground, even if Gray had shown that he was likely to succeed on his Eighth Amendment claims as they pertain to lethal

---

[18] Dr. Groner conceded during his testimony that he is unfamiliar with Virginia's electrocution protocol and that his opinions are based solely on injuries that he observed on two patients who survived a severe electrocution. (Prelim. Inj. Hr'g Tr. 122.)

injection and electrocution, the Court would find that the firing squad is neither "feasible, readily implemented," nor "available" in Virginia. *Glossip*, 135 S. Ct. at 2737 (citations omitted).

It is undisputed that the firing squad is not currently a valid or lawful method of execution in the Commonwealth. *See* Va. Code Ann § 53.1–234. Therefore, a Virginia trial court "would be without any authority to order [Gray] to be executed by [that method]." *Arthur*, 840 F.3d at 1316. Additionally, the VDOC would be unable to carry out Gray's preferred death sentence without the General Assembly fundamentally rewriting its statute. Notwithstanding this, Gray argues that a method of execution need not be authorized by statute for it to be "feasible, readily implemented," or "available" under *Glossip*'s second prong.

The Court disagrees and instead will join the panoply of courts that have confronted this issue in holding that a proposed alternative method of execution must be authorized by statute in order to be considered "available."[19] This finding comports with the Supreme Court's recognition that requiring a state to amend its method-of-execution statute "impos[es] significant costs on the State and the administration of its penal system." *Nelson v. Campbell*, 541 U.S. 637, 644 (2004). The Court concludes that the substantial burden that would be imposed on Virginia if it had to hastily amend its

---

[19] *See, e.g., Arthur*, 840 F.3d at 1314–20, *petition for cert. filed*, No. 16–602 (U.S. Nov. 3, 2016); *Arthur v. Dunn*, --- F.3d ----, 2016 WL 3912038, at *2 n.5 (M.D. Ala. July 19, 2016); *Boyd v. Myers*, No. 2:14–cv–1017–WKW, 2015 WL 5852948, at *4 (M.D. Ala. Oct. 7, 2015); *Kelley v. Johnson*, 496 S.W.3d 346, 359–60 (Ark. 2016), *petition for cert. filed*, No. 16–6496 (U.S. Oct. 20, 2016).

execution statute rings the death knell for Gray's argument that an extra-statutory method satisfies *Glossip*'s second prong.

Moreover, Robinson testified that the firing squad has never been used in the Commonwealth of Virginia, that no correctional officers in the VDOC have been trained to carry out an execution by firing squad, and that no chamber currently exists where such an execution could take place. (Prelim. Inj. Hr'g Tr. 99–100.) Further, Virginia has not developed a protocol to carry out an execution by firing squad. While Gray has pointed to Utah's firing squad protocol as an exemplar, Virginia would not be bound to adopt an identical protocol if it chose to authorize this method of execution.[20] Additionally, although Gray has presented the Court with evidence that the VDOC officers are certified in handling firearms and that those firearms are readily available in the Commonwealth, there is no way for the Court to determine whether these officers and firearms would satisfy the requirements of a hypothetical protocol that the VDOC has not yet adopted.

"[T]he reality is that formulating a new protocol and locating the people and resources necessary to carry out such an alternative . . . would take considerable time and would, inevitably, lead to an entire new round of legal challenges regarding the details of the protocols for constitutionally conducting an execution by firing squad." *Arthur*, 840 F.3d at 1319–20. The lack of currently available resources and inevitable delay that

---

[20] This Court lacks the authority to order that Virginia adopt a specific protocol. *See Baze*, 553 U.S. at 52 n.3 ("[C]ourts have neither the authority nor the expertise to function as boards of inquiry determining best practices for executions."). Even if the Court had the authority to do so, none of the named Defendants in this case have the power to unilaterally amend Virginia's method-of-execution statute in order to adopt a hypothetically ordered protocol.

would accompany the implementation of a new method of execution necessarily undercut any potential argument that the firing squad is presently feasible or readily implemented.

Finally, even if the Court were to determine that the firing squad is a "known and available" as well as "feasible, [and] readily implemented" method of execution in Virginia, it would conclude that the method is not "significantly [likely to] reduce[] a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737 (citations omitted). As discussed above, the Court finds that Gray has failed to demonstrate that he is likely to suffer from "severe pain" under Virginia's current lethal injection protocol. Consequently, he faces a high burden in attempting to demonstrate that the firing squad would somehow be a constitutionally superior method.

Gray's entire argument on this point is premised on Virginia's hypothetical adoption of an identical or similar protocol to the one used in Utah. (*See* Groner Decl. ¶ 9.) As previously noted, should Virginia choose to amend its execution statute and adopt the firing squad, the Commonwealth would be free to adopt whatever protocol it sees fit. This means that it could choose to adopt a substantially different procedure, including, but not limited to, requiring a different number of marksmen, a different caliber of ammunition, or a different location on the inmate's body at which to aim. A change in any one of these elements could have a drastic impact on the likelihood that human error would occur, which, by Dr. Groner's own testimony, could potentially result in an "agonizing" death.

Even if Virginia were to adopt Utah's firing squad protocol, the potential for human error still exists as the inmate could flinch or the executioners could miss their

41

mark.  There is no way for the Court to weigh a risk of human error in a not-yet-adopted

firing squad protocol against any harm that Gray might face if the compounded

midazolam does not render him fully unconscious and insensate.  Consequently, Gray has

not carried his burden of proposing an alternative method of execution that is

"*significantly* [likely to] reduce a substantial risk of severe pain." *Glossip*, 135 S. Ct. at

2737 (quotations omitted) (emphasis added).

In view of the above, the Court concludes that Gray's failure to satisfy *Glossip*'s

second prong further supports a finding that he is unlikely to succeed on the merits of his

Eighth Amendment claim.

### E.      Due Process Challenge to Secrecy Statute

As with his Eighth Amendment claim, Gray is also unlikely to succeed on the

merits of his procedural due process claim.  Gray contends that Virginia's Secrecy

Statute, Va. Code Ann. § 53.1–234, is unconstitutional because it denies him access to

information about Virginia's lethal injection drugs.  Gray asserts that this is a violation of

his procedural due process rights.  However, this argument founders at the starting gate

because no such right exists.

The constitutional right to procedural due process applies "only to the deprivation

of interests encompassed by the Fourteenth Amendment's protection of liberty and

property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).  Thus,

"the range of interests protected by procedural due process is not infinite." *Wofford v.*

*Evans*, 390 F.3d 318, 325 (4th Cir. 2004) (quoting *Bd. of Regents*, 408 U.S. at 570).  The

United States Court of Appeals for the Fourth Circuit has never decided whether a death

row inmate has a right to discover information pertaining to his execution.[21] But every other circuit to address a prisoner's procedural due process challenge to a secrecy statute has squarely rejected it.

Less than a year ago, the Eleventh Circuit held that a prisoner has no procedural due process right "to know where, how, and by whom the lethal injection drugs will be manufactured, as well as the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1292–93 (11th Cir.), *cert. denied sub nom. Jones v. Bryson*, 136 S. Ct. 998 (2016). The Fifth, Sixth, and Eighth Circuits have reached similar conclusions. *See Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016) ("Plaintiffs argue that HB 663 prevents them from bringing an effective challenge to Ohio's execution procedures. Specifically, they maintain that HB 663 'denies [them] an opportunity to discover and litigate non-frivolous claims.' But no constitutional right exists to discover grievances or to litigate effectively once in court." (internal quotation marks omitted) (citation omitted)); *Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir.), *cert. denied*, 135 S. Ct. 2941 (2015) ("[T]he Constitution does not require such disclosure. A prisoner's assertion of necessity—that [the State] must disclose its protocol so he can challenge its conformity with the Eighth Amendment—does not substitute for the identification of a cognizable liberty interest." (internal quotation marks omitted) (citations omitted)); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir.), *cert. denied*, 135 S. Ct. 41 (2014) ("A due

---

[21] In the context of Virginia's statutory bar preventing prisoners from making Freedom of Information Act requests, the Fourth Circuit has generally disclaimed the notion that a prisoner has a right to "discover grievances, and to litigate effectively once in court." *Giarratano v. Johnson*, 521 F.3d 298, 306 (4th Cir. 2008) (citation omitted).

process right to disclosure requires an inmate to show a cognizable liberty interest in obtaining information about execution protocols . . . . However, we have held that an uncertainty as to the method of execution is not a cognizable liberty interest." (citation omitted)).[22] Likewise, this Court will adopt the same reasoning as the Fifth, Sixth, Eighth, and Eleventh Circuits in finding that Gray has no procedural due process right to discover information about Virginia's lethal injection drugs. Therefore, because Gray is unlikely to succeed on the merits of his procedural due process claim, this factor weighs strongly against granting a preliminary injunction.

Gray also argues that the Court should stay his execution to provide time for discovery regarding his perceived Eighth Amendment claim. Gray requests that the Court order discovery to occur prior to the parties' initial Rule 26(f) conference pursuant to Fed. R. Civ. P. 26(d)(1). However, that request will be denied because, as discussed, Gray is unlikely to succeed on the merits of his underlying claims. As such, the Court is unwilling to delay Gray's execution so that he can embark on a fishing expedition. The Court, therefore, declines to address whether the privilege provided by Virginia's secrecy statute would hypothetically apply to this federal litigation.

Although the Court has devoted the majority of this opinion to addressing how Gray falls woefully short of demonstrating that he is likely to succeed on the merits of his claims or that he is likely to suffer irreparable harm, two additional factors firmly

---

[22] The Ninth Circuit is the only circuit court to reach the opposite conclusion. In a First Amendment challenge to Arizona's secrecy statute, the Ninth Circuit reversed the district court's denial of plaintiff's motion for a preliminary injunction. *Wood v. Ryan*, 759 F.3d 1076, 1088 (9th Cir. 2014). However, the United States Supreme Court promptly reversed and vacated that opinion. *Ryan v. Wood*, 135 S. Ct. 21 (2014).

foreclose the availability of injunctive relief. Namely, Gray fails to make any showing that the balance of the equities favor him or that the public interest and equitable principles favor the grant of an injunction.

### VI. The Balance of the Equities Favors the Commonwealth

Evaluating the balance of equities requires the Court to assess the relative harm facing both parties. *See E.I. DuPont de Nemours & Co. v. Kolon Ind., Inc.*, 894 F. Supp. 2d 691, 708 (E.D. Va. 2012). Thus, on Gray's side of the scale is the possibility that he will experience some incremental discomfort and associated pain in his inevitable execution should the compounded midazolam fail to perform as expected.

Gray's potential harm is "a thin shadow compared to the certain, profound and [significant] harm to the state if an injunction is issued." *Reid v. Johnson*, 333 F. Supp. 2d 543, 552 (E.D. Va. 2004). It is well settled that the state has "a significant interest in meting out a sentence of death in a timely fashion." *Nelson v. Campbell*, 541 U.S. 637, 644 (2004) (citing *Calderon v. Thompson*, 523 U.S. 538, 556–57 (1998); *In re Blodgett*, 502 U.S. 236, 238 (1992) (per curiam); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991) ("[T]he power of a State to pass laws means little if the State cannot enforce them")). The state's interest in finality and in carrying out a sentence of death in a timely manner acquires "an added moral dimension" when the lengthy state and federal proceedings reviewing the conviction and sentence have run their course. *Calderon*, 523 U.S. at 556. At this point, the state and the victims of crime can expect the moral judgment of the state to be carried out without delay. *Id.* at 556 (citing *Payne v. Tennessee*, 501 U.S. 808 (1991)). "To unsettle these expectations is to inflict a profound injury to the powerful and

legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Id.* (internal quotation marks omitted) (citations omitted). Here these harms are magnified by the appalling number of people, including two children ages four and nine, whom Gray tortured and killed. Accordingly, the balance of the equities firmly favors the Commonwealth.

### VII. The Public Interest and Equitable Principles Favor Denying the Request for an Injunction

This is not an instance where there are any questions as to innocence or sufficiency of due process of an individual set to be executed. Gray's "claim to receive a sentence of death without any unnecessary pain pales in comparison to the interest the general public has in the orderly administration of justice." *Reid*, 333 F. Supp. 2d 543 at 553 (citing *Calderon*, 523 U.S. at 556–57 ). Thus, the Fourth Circuit has admonished that, "[l]ast minute stays [of execution] . . . represent an interference with the orderly processes of justice which should be avoided in all but the most extraordinary circumstances." *Stockton v. Angelone*, 70 F.3d 12, 13 (4th Cir. 1995) (per curiam). This is not such a case. The public interest in denying a stay rests firmly on the side of the Commonwealth.

Additionally, the Court must consider the timing and nature of Gray's request under general equitable principles. *See Nelson*, 541 U.S. at 649–50. In this respect, the Supreme Court instructed that courts should not countenance manipulation of the judicial process and emphasized that "there is a strong equitable presumption against the grant of

a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Id.* at 650.

Gray received two death sentences for the murders of Ruby and Stella Harvey on October 23, 2006, yet he waited until one month before his scheduled execution to bring a challenge to Virginia's method for carrying out his sentence. At the time Gray committed the horrific murders, Virginia used lethal injection as one method to execute those individuals sentenced to death. Moreover, ever since his 2006 sentencing, Gray was aware that Virginia would carry out that sentence either by electrocution or lethal injection. Gray's suggestion, that he could not have not challenged the method of his execution before October 2016, when he discovered that Virginia intended to perform his execution with compounded midazolam and potassium chloride, rings hollow. The difficulty states have faced in obtaining the appropriate drugs for conducting a lethal injection has been widely publicized and a topic of public debate for a number of years. Gray should have anticipated that Virginia might face similar problems in securing the drugs to execute him, particularly in the wake of an almost identical challenge in October 2015. *See Prieto v. Clarke*, No. 3:15CV587–HEH, 2015 WL 5793903 (E.D. Va. Oct. 1, 2015). Additionally, despite Gray's contention that he only learned that the state would use two compounded drugs in October, the underlying challenge to these two drugs is hardly novel. Gray fails to put forth any evidence that compounded drugs, in and of themselves, pose a risk that is "*sure or very likely* to cause serious illness and needless suffering." *Glossip*. 135 S. Ct. at 2737 (internal quotation marks omitted) (quoting *Baze*, 553 U.S. at 50).

47

If Gray acted with appropriate diligence, he would have had ample opportunity to address his concerns without disrupting the execution date set by the state court. By waiting as long as he did, Gray "leaves little doubt that the real purpose behind his claim is to seek a delay of his execution, not merely to effect an alteration in the manner in which it is carried out." *Harris v. Johnson*, 376 F.3d 414, 418 (5th Cir. 2004). Gray's delay in this matter is of significant magnitude and weighs heavily against him. *See Gomez v. U.S. Dist. Ct. for the Northern Dist. of Cal.*, 503 U.S. 653, 653–54 (1992) (per curiam); *Grayson v. Warden, Comm'r, Ala. Dep't of Corr.*, --- F. App'x ----, 2016 WL 7118393, at *8 (11th Cir. 2016) ("While each death case is very important and deserves our most careful consideration, the fact that [the prisoner] has petitioned us for a stay of execution only at the very last moment, and without adequate explanation, also suggests to us that the equities do not lie in his favor." (quoting *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1297–98 (11th Cir. 2016))); *Brooks v. Warden, Comm'r, Ala. Dep't of Corr.*, 810 F.3d 812, 825–26 (11th Cir. 2016).

## VIII. Conclusion

The grant of interim injunctive relief is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation marks omitted). Each of the factors the Court must consider in granting such relief weigh decidedly and firmly against Gray. Accordingly, Plaintiff's Motion for Preliminary Injunctive Relief (ECF No. 13)

will be denied.  Plaintiff's Motion for a Temporary Restraining Order (ECF No. 12) will

be denied as moot.

     An appropriate Order will accompany this Memorandum Opinion.

 

                                          /s/

                               HENRY E. HUDSON

Date: Jan. 10 2017             UNITED STATES DISTRICT JUDGE

Richmond, Virginia